UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN THE MATTER OF THE COMPLAINT,

of

KEVIN TREANOR, AS OWNER OF THE
*KANDI WON*, A 34 FOOT, SILVERTON,
RECREATIONAL VESSEL FOR
EXONERATION FROM OR LIMITATION
OF LIABILITY,

                Petitioner.
------------------------------------------------------------X

**OPINION AND ORDER**
**13-CV-5489 (SJF)**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ NOV 08 2015 ★

LONG ISLAND OFFICE

FEUERSTEIN, District Judge:

On October 3, 2013, petitioner Kevin Treanor ("petitioner" or "Treanor") brought this action pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501–30512 seeking exoneration or limitation of liability for the July 4, 2012 capsizing of his recreation vessel, the *Kandi Won*. On December 20, 2013, claimant Paul Gaines (Gaines) filed an answer and counterclaims seeking compensatory damages as executor and administrator of daughter Victoria Gaines, who drowned when the *Kandi Won* capsized, and as guardian for his minor son, Ryan Gaines. [Docket No. 9].[1]

On April 3, 2015, following the close of discovery, Gaines moved for summary judgment, arguing that petitioner was negligent in overloading the vessel. [Docket No. 24]. On May 1, 2015, claimants James and Kristin Dolan and the Town of Oyster Bay (collectively "Dolans") joined in the motion for summary judgment, and submitted a supplemental memorandum of law with exhibits. [Docket No. 26]. On May 1, 2015, claimants Silverton Marine Corporation, Luhrs Marine Group, and Morgan Industries Corporation filed a separate

---

[1] Gaines also filed an action in New York State court, *Gaines v. Treanor*, et al. No. 63307/2013, naming petitioner, Salvatore, Deborah, and Gregory Aureliano, Guy DeNigris, Silverton Marine Corporation, Luhrs Marine Group, Morgan Industries Corporation, and James and Kristin Dolan as defendants.

motion to dismiss and exhibits. [Docket Entry No. 28]. On July 1, 2015, petitioner submitted a "trial brief" and exhibits. [Docket No. 35]. The parties subsequently requested that the Court decide the entire controversy by trial on the papers pursuant to Rule 52(a). [Docket Entry Nos. 34, 26].[2] The application for trial pursuant to FRCP 52(a) is denied, the parties' motions are considered as cross-motions for summary judgment, and for the reasons that follow, claimants Gaines's and Silverton's motions to dismiss petitioner's claims for exoneration or limitation-of-liability are granted, and petitioner's claim for exoneration or limitation-of-liability is denied.

I.   Factual Background

From 1989 to 1996 or 1998, petitioner owned a 1988 "Sun Runner," a nineteen foot (19') recreational motor boat with an open configuration. Treanor Trial Brief (Tr. Br.), Ex. G, Petitioner's Deposition (Pet'r's Dep.) 16:6–17:7. The boat had a metal plate which displayed the vessel's maximum weight and passenger capacity, and an owner's manual; petitioner read and obeyed both. Pet'r's Dep. 21:12–16, 22:4–10, 23:24–24:5, 40:4–13.

In April or May of 2011, petitioner purchased the *Kandi Won*, a used thirty-four foot (34') recreational motor yacht, known as a "34C," manufactured by claimant Silverton, Inc. (Silverton). Pet'r's Dep. 11:16–18, 34:14. The *Kandi Won* had a bridge deck, referred to as a "flybridge," that was on a second level above an enclosed cabin. Tr. Br., Ex. D, Salvatore Aureliano Deposition (S. Aurel. Dep.) 26:23–27:15. The flybridge had six (6) seats, the convertible cabin sofa had four (4) seats, the dinette benches could accommodate four (4), the cockpit had four (4) seats, and the forward deck had four (4) seats, for a total of twenty-two (22)

---

[2] "[A] district court may decide a case by summary bench trial upon stipulation of the parties as long as the parties have willingly forgone their right to a full trial. But . . . a district court's decision to proceed under Rule 52(a) rather than Rule 56 must be made clear to the parties before the court can proceed to decide triable issues of fact." *Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142–43 (2d Cir. 1998). Here, it appears that Gaines consented to a trial on the papers due to petitioner's erroneous representation that a summary judgment motion without a Local Civil Rule 56.1 must be denied. *E.g., Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).

2

seats. Tr. Br., Ex. A14, Alcus Marine Technical Services, Inc. "Survey and Investigative Findings" (Alcus Rep't) 2. Silverton's specifications for the 34C indicate that the maximum recommended number of passengers is ten (10), and the maximum recommended load was two thousand two hundred twenty-seven pounds (2,227 lbs). Silverton Brief (Silv. Br.), Ex. B.

The previously owned *Kandi Won* did not come with an owner's manual, and petitioner did not contact Silverton, or a local dealer to obtain one; he did, however perform an internet search for operating instructions only, which he claimed did not yield any safety information. Pet'r's Dep. 24:22–25:24. He denied any knowledge of the *Kandi Won*'s maximum occupancy and weight capacity, but indicated that if he had known them, he would not have exceeded either one. Pet'r's Dep. 23:6–12, 26:1–9. He carried between twenty-seven (27) to thirty (30) adult, and five (5) to eight (8) children's life preservers aboard. Pet'r's Dep. 40:22–42:7.

Petitioner had taken between ten (10) and thirty-two (32) trips on the *Kandi Won* between the time he purchased it, and the night it capsized, July 4, 2012. Pet'r's Dep. 37:1–6. He had piloted the vessel each time, although his brother, Michael Treanor, as well as Salvatore Aureliano, Guy DeNigris, and Gregory Aureliano also took turns at the wheel on these trips. Pet'r's Dep. 38:1–39:12.

On July 4, 2012, petitioner's family, the Aureliano family, and others gathered at Knutson's Marina in Huntington at around seven (7) p.m. Dolan Declaration (Dolan Decl.), Ex. A., July 2013 Investigation Report: The Sinking of the Kandi Won, July 4, 2012 (Investig. Rep't), [Docket Entry No. 27-1].[3] Twenty-seven (27) passengers boarded the *Kandi Won*, including twelve (12) adults, seven (7) adolescents and young adults ranging in age from fifteen

---

[3] Petitioner objects that the entire Investigative Report constitutes "textbook hearsay for which no exception applies." Pet'r's Tr. Br. 10–11. However, conclusions and facts contained in an investigative report fall within a hearsay exception, so long as the report evinces trustworthiness. FED. R. EVID. 803(8)(A)(iii) an (B). The report is trustworthy and is therefore, admissible, although the Court disregards certain hearsay statements found within.

(15) to twenty-one (21), and eight (8) children between the ages of seven (7) and twelve (12). *Id.* at 3. Together, the passengers weighed approximately three thousand five hundred and twenty pounds (3,520 lbs). *Id.* After bringing food, soda, beer, and wine aboard, they left the marina to watch the annual fireworks display in Oyster Bay Harbor, which was hosted by claimants, James and Kristin Dolan. *Id.* The water was calm as they left the marina. Dolan Decl., Ex. B., Deposition of Vagie Ray Rivers (Rivers Dep.) 12:14.

Most passengers stated that the trip from the marina to the fireworks display was uneventful, but Guy DeNigris, who piloted the *Kandi Won* for a portion of the trip, told police officer Norman McCloy that he "thought the vessel had water in its bilge, or, as an afterthought now, maybe a lot of weight on board because the vessel had been listing (leaning or tilting) back and forth[,]" and that at one point, it "listed quite a bit, but . . . recovered." Investig. Rep't. 3, 5. Petitioner denied this, and testified that the *Kandi Won* felt stable throughout the trip. Pet'r's Dep. 60:4–12.

The fireworks display began at 9:20 p.m., and lasted roughly thirty (30) minutes, during which time the passengers ate, and went swimming. Investig. Rep't 3. More than a hundred (100) boats anchored to watch the fireworks. *Id.*; Tr. Br., Ex. C, Gregory Aureliano Deposition (G. Aurel. Dep.). The Investigative Report stated that a sailboat, occupied by an unidentified intoxicated man and his female companion, tied itself to the *Kandi Won* during the fireworks display, and the man allegedly offered to take passengers back to the marina to relieve the overcrowding on the *Kandi Won*, although petitioner contends that the he neither heard nor declined this offer. Pet'r's Dep. 111:21–131:4; Investig. Rep't 4.

Immediately following the fireworks display, the *Kandi Won* raised anchor, which took ten (10) minutes, and, piloted by Salvatore Aureliano, left the area in a procession with other boats traveling North at around 10:00 p.m. Investig. Rep't 3. The *River Boat*, a twenty-four foot

(24') center console sport fishing boat, followed immediately behind at a distance of roughly one hundred and fifty (150) to two hundred (200) yards, and both boats traveled at a speed of approximately twenty miles per hour (20 mph). Rivers Dep. 11:13–21, 24:3. 27:7–9. The *Kandi Won* and the *River Boat* were among the first few vessels to leave the fireworks display. Rivers Dep. 18:4–13. Vagie Ray Rivers (Rivers), an experienced recreational boater, piloted the *River Boat* with help of radar and a chart-plotter, and could see every vessel in all directions within a one (1)-mile radius. Rivers Dep. 20:2–21:19, 29:4.

The sky was dark and overcast, the air and sea were "dead calm," and a thunderstorm was approaching from the direction of Greenwich, Connecticut. Rivers Dep. 17:14–22, 27:15–19. Salvatore Aureliano described the sea as like "glass," but starting to become choppy as a result of the approaching storm. S. Aurel. Dep. 183:4, 222:20–24. The National Weather Service special immediate broadcast bulletin issued at 10:04 p.m. advised boaters to seek safe harbor and stated that radar had detected a thunderstorm four (4) nautical miles northwest of Captain Harbor, Connecticut, and was forecasted to hit Captain Harbor by 10:10 p.m., Hempstead Harbor by 10:20 p.m., and Cold Spring Harbor, New York by 10:25 p.m. Investig. Rep't 10. A 10:13 p.m. updated bulletin indicated that the thunderstorm would produce winds of over thirty-five miles per hour (35 mph), which would arrive three (3) miles southwest of Cold Spring Harbor by 10:25 p.m. Investig. Rep't 10.

Rivers testified that one vessel, less than twenty feet (20') in length traveled parallel to the *Kandi Won* as it left the fireworks display, at a distance of three (3) to four (4) hundred yards off the port side, although it was too far away for its wake to reach the *Kandi Won* or the *River Boat*. Rivers Dep. 31:21–32:13. Salvatore Aureliano testified that it was one hundred (100) yards from the port side of the *Kandi Won*, too far away for him to identify. S. Aurel. Dep. 167, 170:14-21. He also testified that this boat overtook the *Kandi Won*. S. Aurel. Dep. 222:16–24.

5

Another vessel traveled further behind the *Kandi Won* off the starboard side at an even greater distance. S. Aurel. Dep. 167:4–23, 180:16–19. It is undisputed that no vessels crossed in front of the *Kandi Won*. Rivers Dep. 28:16–22, 29:9–11. Eight (8) people, including four (4) adults and four (4) children, with a combined weight of approximately nine hundred and eighty-eight pounds (988 lbs) were on the flybridge. Investig. Rep't 9. Petitioner was in the back of the boat with five (5) other adults and one (1) child. Investig. Rep't 9.

The *Kandi Won* traveled a short distance, then capsized at around 10:05 p.m. at the mouth of Cold Spring Harbor. Investig. Rep't 3–4. S. Aurel. Dep. 178:11; Rivers Dep. 9 According to the Investigative Report,

> [Salvatore] Aureliano stated that just before the Kandi Won capsized, the boat started turning to the right and then leaned hard to the right. He stated that he tried to steer to the left and used the throttles to slow the boat to "idle". The boat just kept leaning further and further until it capsized and then overturned completely. . . . Mr. Aureliano stated that it was very dark and he could not tell if he had caught a wave.

Investig. Rep't 4. Salvatore Aureliano explained that shortly after the unidentified boat overtook the *Kandi Won* on the port side, he felt it jerk to the right, and then keel over within a few seconds. S. Aurel. Dep. 222:15–18, 175:21–176:14, 179:16–17. He believed that a wave hit him, but did not discount the possibility that he hit a submerged object. S. Aurel. Dep. 291:21–22, 292:8. Petitioner's expert report showed some hull damage, including a scrape on the port side of the hull, a paint scratch on the lower edge of the starboard rudder, a broken paddlewheel-type speedometer sensor on the starboard side, a bent prop, impact damage to the bottom of the port side of the hull bottom, including chipped paint, missing starboard side trim tab, damaged boot stripe, damage to the aft edge of the teak swim platform, and damage to the starboard transom corner. Alcus Rep't 3. Gregory Aureliano described hearing "two big bumps" in short succession, which caused the *Kandi Won* to lurch toward starboard, start to recover, and then

capsize completely. G. Aurel. Dep. 39:18–40:9. He did not know whether the bumps were caused by waves or a submerged object. G. Aurel. Dep. 40:2–3. After the second bump, the passengers were thrown from the *Kandi Won*. Investig. Rep't 3–4.

The *River Boat* came upon the *Kandi Won* as it was on its side, and as its passengers fell into the water. Rivers Dep. 34:14–35:6. Rivers radioed a mayday to the Coast Guard, who asked him how many passengers were on it, which nobody, including petitioner, knew. Rivers Dep. 60:14; 34:60:6–16; Pet'r's Dep. 91:9–12, 92:16–20. A Coast Guard vessel arrived on scene within five (5) minutes. Investig. Rep't 4. Rivers lit signal flares, and other boaters immediately arrived to assist. Rivers Dep. 47:22–25. Witnesses disagree as to how long the *Kandi Won* was on its side before overturning completely, although most agreed that it turned over "very quickly" and floated in that position for roughly one (1) hour. Investig. Rep't 4, 19.

Within ten (10) or fifteen (15) minutes after the *River Boat* encountered the stricken *Kandi Won*, it began to rain, the wind picked up, and weather conditions worsened thereafter. Rivers Dep. 51:7–10. Local police arrived on scene, as did a local fire department dive team, which recovered petitioner's eleven (11)-year-old daughter's body beneath the cockpit at 11:00 p.m. Investig. Rep't 19. Two (2) minutes later, the *Kandi Won* began to sink to its final depth of sixty-five feet (65'), and the operation was converted to a deep-water recovery. *Id.*; McCloy Dep. 52:22–54:13. Nassau County, New York City police department, and Cold Spring Harbor fire department divers arrived on scene, and recovered the bodies of seven (7)-year-old Victoria Gaines and twelve (12)-year-old David Aureliano from the cabin in the early morning hours of July 5, 2015. Investig. Rep't 7–8, 19; McCloy Dep. 54:6–8.

On July 9, 2012, a Federal Bureau of Investigation (FBI) dive team produced a video recording of the *Kandi Won* on the bottom of Long Island Sound. Investig. Rep't 11. They raised the wreck, and returned it to the Oyster Bay Marine Center. Investig. Rep't 10. There,

7

police officer Normal McCloy, a twenty-six (26)-year veteran of the Nassau County Police Marine Bureau and trained marine accident investigator, inspected it over the course of several days to determine the cause of the accident. Investig. Rep't 12; Tr. Br., Ex. F, Normal McCloy Deposition (McCloy Dep.) 10:6, 69:8–9. He ruled out likely causes of the *Kandi Won*'s instability. McCloy Dep. 66:22–24, 69:10–70:18. He ruled out bilge-water as the cause of the accident because the automatic bilge pumps functioned normally, and because he found no maintenance issues which would have caused water to accumulate in the bilge. Investig. Rep't 12; McCloy Dep. 70:4-17.

Neil Gallagher, B.S., M.S., P.E., a Professor of Marine Engineering and Naval Architecture at the Webb institute performed a stability analysis of the *Kandi Won* for McCloy. Investig. Rep't 12; McCloy Dep. 74:1–11. Gallagher found no evidence of damage to the hull. Investig. Rep't 12. Using United States Coast Guard weight-estimates for passengers, McCloy found that the *Kandi Won* could accommodate between eight (8) to (12) passengers, or as many as fifteen (15) passengers, assuming that half were children. Investig. Rep't 14. On October 18, 2012, McCloy and Gallagher performed an "inclining experiment" used by the United States Coast Guard, which determined that the *Kandi Won* capsized because it was loaded with twenty-seven (27) passengers on July 4, 2012, which reduced its stability by sixty percent (60%). Investig. Rep't. 12–13.

The Nassau County District Attorney's Investigative Report concluded that the *Kandi Won* capsized as a result of "being overloaded" with, and having "apparently encounter[ed] a 90 wave." Investig. Rep't 1.[4] With the weight of twenty-seven (27) passengers, and the positioning of the passengers on the flybridge, it had a high center of gravity, which gave it low

---

[4] There was some suggestion that the incoming tide reached its peak current at 10:03 p.m. on July 4, 2012. S. Aurel. Dep. 268:21–24.

stability in flat water, although enough to remain upright, however, it would capsize if struck by a two foot (2') tall, ninety-degree (90°) wave. Investig. Rep't 13. "The combination of the weight, its distribution and the angle of the incoming wave each contributed to making the capsizing of the *Kandi Won* inevitable." Investig. Rep't 1–2.

## II. DISCUSSION

### A. Summary Judgment Standard.

Summary judgment is available in maritime limitation-of-liability proceedings. *E.g.*, *In re Bridge Const. Servs. of Florida, Inc.*, 39 F. Supp. 3d 373, 384 (S.D.N.Y. 2014). A court may grant summary judgment if there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting FRCP 56(a)). Thus, where the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact, the moving party is entitled to judgment. *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.*; *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

A "genuine" issue of fact exists only if the "evidence [presented] is such that a reasonable jury could return a verdict for the nonmoving party." *Giordano v. City of New York*, 274 F.3d

740, 746–47 (2d Cir. 2001). "[A]ttempts to twist the record do not create a genuine issue of material fact for a jury." *Kim v. Son*, No. 05 Civ. 1262, 2007 WL 1989473, at *6 (E.D.N.Y. July 9, 2007). Therefore, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). In addition, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Finally, FRCP 56(c) mandates that all facts under consideration in a motion for summary judgment be directly supported by proof in admissible form.

## B. Limitation of Liability

District courts employ a two-step analysis in maritime limitation-of-liability actions in negligence cases. *The 84-H*, 296 F. 427, 432 (2d Cir. 1923). First, the claimant must prove by a preponderance of evidence that the owner is liable by way of negligence. *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 115 (2d Cir. 2012); *In re Cornfield*, 365 F. Supp. 2d 271, 276 (E.D.N.Y. 2004) *aff'd sub nom. Cornfield v. Cornfield*, 156 F. App'x 343 (2d Cir. 2005); *In re Moran Towing Corp.*, 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001); *see 84-H*, 296 F. at 432. If the claimant establishes negligence, the burden shifts to the owner to prove the owner's "lack of privity or knowledge." *84-H*, 296 F. at 432. The Supreme Court has instructed that district courts should construe the maritime limitation-of-liability statute according to its legislative purpose of encouraging American shipbuilding and maritime commerce by limiting shipowner liability and thereby encouraging investment. *See* 7 BENEDICT ON ADMIRALTY § 7 (2009) (citing *Liverpool, Brazil & River Plate Steam Nav. Co. v. Brooklyn E. Dist. Terminal*, 251 U.S. 48, 53, 40 S. Ct. 66, 66 (1919); *The Main v. Williams*, 152 U.S. 122, 128, 14 S. Ct. 486, 487 (1894)).

### 1. Negligence

Ordinary principles of common law negligence apply to a maritime negligence claim.

*Cornfield*, 365 F. Supp. 2d at 276 (citing *Petition of the Kinsman Transit Co.*, 338 F.2d 708, 721 (2d Cir. 1964)). Courts also look to the law of New York for injuries that occur in its waters. *Jurgens v. Poling Transp. Corp.*, 113 F. Supp. 2d 388, 396–97 (E.D.N.Y. 2000) (citing *International Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 38 F.3d 1279, 1284 (2d Cir. 1994)). A claimant must establish a legal duty, a breach of that duty, causation, and damages. *Id.* "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) (citing *Leathers v. Blessing*, 105 U.S. 626 (1881); *The Max Morris*, 137 U.S. 1 (1890); *The Admiral Peoples*, 295 U.S. 649 (1935)); *see Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 170–71 (2d Cir. 1983) (rejecting heightened duty of care for an owner vis-à-vis passengers).

The duty of care depends upon the risk to the passenger, and a "shipowner is not an insurer of its passengers' safety." *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir. 1988) (citing *Moore v. American Scantic Line, Inc.*, 121 F.2d 767, 768 (2d Cir. 1941); *Demgard v. United States*, 94 F. Supp. 309, 310 (S.D.N.Y. 1950)). An owner breaches his or her duty of reasonable care by engaging in conduct that creates a foreseeable and unreasonable risk of harm. *See, e.g., In re Seaboard Shipping Corp.*, 449 F.2d 132, 137 (2d Cir. 1971) (citing *Kinsman Transit*, 338 F.2d at 723–24)). To prove negligence, a maritime claimant must show that the shipowner had actual or constructive notice of the dangerous condition. *Monteleone*, 838 F.2d at 65 (citations omitted).

To establish negligence, a claimant must demonstrate that the owner's negligence constituted "a substantial factor in producing" the injury, *Jurgens*, 113 F. Supp. 2d 401 (quoting *Bonsignore v. City of New York*, 683 F.2d 635, 637 (2d Cir. 1982)), or that the owner's negligence was the "cause-in-fact" or "but-for" cause of the injury. 1 THOMAS SCHOENBAUM,

ADMIRALTY AND MARITIME LAW § 5-3 n.7 (2011) (citing *Dunn v. S. Charters*, Inc., 539 F. Supp. 661, 669 (E.D.N.Y. 1982)). Due to the application of the comparative fault doctrine, a claimant need not establish that the owner's negligence is the sole cause of the injury. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S. Ct. 1708, 1716 (1975).

Petitioner, as the owner of the *Kandi Won*, owed a duty to his passengers to avoid rendering it unseaworthy by overloading it. *See, e.g., The Linseed King*, 24 F.2d 967, 972 (S.D.N.Y. 1928) ("There was another act of negligence, contributory, no doubt, to the loss sustained, namely, the large number of passengers who were permitted to board the boat and enter the cabin, the only place (there being no outside deck space) where they could be."). Under well-established principles of Second Circuit maritime negligence law, an owner breaches his or her legal duty of reasonable care by failing to take simple precautions to prevent foreseeable and serious injury. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.) ("Learned Hand Rule"); *see In re City of New York*, 522 F.3d 279, 284 (2d Cir. 2008) (holding that petitioner breached its duty of reasonable care by failing to abide minimally burdensome "two-pilot" guideline, which would have prevented serious harm even though likelihood of one pilot becoming incapacitated was small) (citing *id.*); *see generally Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 826 (2d Cir. 1994) ("Reasonable care is determined in light of whether or not a particular danger was foreseeable."); *Poplar v. Bourjois, Inc.*, 298 N.Y. 62, 67, 80 N.E.2d 334, 336 (1948) ("As a general proposition, liability for negligence turns upon the foreseeability of any harm resulting from the careless conduct, not upon the foreseeability of the exact nature and extent of the injury which does in fact ensue."). "The gravity of the potential injury ... is well illustrated by the harm actually done in this case—the loss of" three (3) lives. *Id.*

The likelihood that the *Kandi Won* would capsize if overloaded was foreseeable. The uncontroverted stability analysis performed by Gallagher and McCloy indicated that due to the

*Kandi Won*'s overloading with twenty-seven (27) passengers, and the excess weight of eight (8) passengers on the flybridge, it was "'inevitable'" that it would capsize if it encountered a two (2)-foot ninety degree (90°) wave or wake from a passing boat. Investig. Rep't 12–14. Salvatore Aureliano stated that it was "common sense" that a vessel's maximum capacity for passengers should never be exceeded, and that overloading a vessel could reduce its stability. S. Aurel. Dep. 36;5, 31:4–9, 31:16–17. And while petitioner denied that he understood the dangers of overloading a vessel, that he ever considered stability, or that he knew the capacity of the *Kandi Won*, he indicated that had he known its capacity, he would have obeyed it, and stated that he had obeyed the capacity plate on his previous vessel. Pet'r's Dep. 44:4–13, 22:11–15, 91:20–92:4, 26:1–9, 21:12–24.

Yet petitioner took minimal steps to learn the *Kandi Won*'s weight or passenger capacity. He did not inquire of the seller its capacity, did not contact a dealership or the manufacturer, and did not perform an internet search to obtain an owner's manual. Pet'r's Dep. 26:10–13, 25:21–24, 25:15–20, 59:16–17, 60:6–7. Had he done so, he would have learned that the maximum passenger and weight capacity were ten (10) passengers and two thousand two hundred twenty-seven pounds (2,227 lbs), respectively. Silv. Br., Ex. B. If half the passengers were children, the most the *Kandi Won* could have safely accommodated was fifteen (15) passengers. Investig. Rep't 14. Moreover, petitioner indicated that he knew not to load more passengers than available seats, of which there were twenty-two (22). Pet'r's Dep. 24:1–10, Alcus Rep't 2. It is undisputed that he allowed twenty-seven (27) passengers to board the *Kandi Won* on July 4, 2012 without counting them. Investig. Rep't 1, 3; Pet'r's Dep. 91:1–91:16, 92:16–20. Given the foreseeability of danger of overloading a vessel, and the minimal burden of avoiding it, petitioner breached his duty of reasonable care.

Petitioner argues that the *Kandi Won* capsized due to: striking a submerged object, a

13

wave, a passing boat's wake, rough seas from the approaching thunderstorm, water in the bilge, unsecured cabin furniture, navigational error, or its design. Pet. Br. 15–24. He points to scratches on the *Kandi Won*'s hull, and other minor damage, and the deposition testimony of Gregory Aureliano, and suggests that the *Kandi Won* struck a submerged object, which contributed to the capsizing. Alcus Rep't 3; G. Aurel. Dep. 39:18–40:9. He also points to The Investigative Report, his deposition testimony, that of and Gregory and Salvatore Aureliano, to suggest that a wave or wake affected the *Kandi Won*, as did the pilot's steering and throttle response. *Id.*; Investig. Rep't. 3; S. Aurel. Dep. 291:21–22, 292:8. However, none of these theories negate the fact that overloading constituted a substantial factor contributing to the July 4, 2012 capsizing, which was the conclusion of the Nassau County District Attorney's Investigative Report and McCloy's investigation. Invest. Rep't 1; McCloy Dep 78–79.

### 2. Privity and Knowledge

The term "privity or knowledge" is a term of art that connotes "'complicity in the fault that caused the accident.'" *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (quoting *Blackler v. F. Jacobus Transportation Co.*, 243 F.2d 733, 735 (2d Cir. 1957) (citations omitted)). It requires more than a showing of negligence on the part of the vessel owner. *Deslions v. La Compagnie Generale Transatlantique*, 210 U.S. 95, 122, 28 S. Ct. 664, 673 (1908). This defense fails when the owner personally participates in the negligent act, *84-H*, 296 F. at 431, or when an owner has actual or constructive knowledge of the dangerous condition. *Otal Investments*, 673 F.3d at 115 ("'Privity or knowledge' can be actual or constructive. Either way, the term usually implies some degree of culpable participation or neglected duty on the shipowner's part; that, for example, it committed a negligent act . . . or through the exercise of reasonable diligence could have prevented the commission of the act. . . .") (quoting *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999)); *Republic of France v. French Overseas*

14

*Corp.*, 277 U.S. 323, 331, 48 S. Ct. 516, 517 (1928) (failure to exercise due diligence in ascertaining dangerous condition defeats a claim for exoneration or limitation-of-liability). Privity or knowledge "turns on the facts of particular cases." *Coryell v. Phipps*, 317 U.S. 406, 411, 63 S. Ct. 291, 294 (1943).

Petitioner personally participated in the negligent act of overloading the vessel by inviting or allowing the twenty-seven (27) passengers to board the *Kandi Won*. S. Aurel. Dep. 91:8–13. Although he did not count the passengers, or learn the vessel's maximum weight or passenger capacity, he could have done so with "reasonable diligence." *French Overseas Corp.*, 277 U.S. at 331, 48 S. Ct. at 517. Consequently, he had both privity and knowledge of the overloading, and his claim for limitation of liability or exoneration fails. *Accord The Linseed King*, 24 F.2d at 973 ("Permitting the overcrowding of the cabin was an act of negligence and must be condemned, and, if it was with the knowledge and privity of the corporation or the manager of its plant, the right to limit liability must be denied.").

### III. CONCLUSION

For the foregoing reasons, petitioner's claim for exoneration or limitation of liability is denied and Gaines's and Silverton's motions for dismissal of Treanor's petition for exoneration or limitation of liability is granted.

**SO ORDERED.**

                                              s/ Sandra J. Feuerstein
                                              Sandra J. Feuerstein
                                              United States District Judge

Dated: November 6, 2015
       Central Islip, New York